UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JEFFREY A. HANSHEW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:06-cv-846-JDT-WTL |
| ) | |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

**Entry on Plaintiff's Motion for Summary Judgment or Remand (Doc. No. 16)**[1]

Jeffrey A. Hanshew applied for social security disability benefits alleging a disability onset date of September 13, 2001, and that he could not work due to low back pain and depression. Administrative Law Judge Albert J. Velasquez held a hearing and issued a decision on August 23, 2005, finding Mr. Hanshew not disabled. Mr. Hanshew's application ultimately was denied by the Commissioner of Social Security. He now seeks judicial review.

*Medical Evidence of Back Pain*

Jeffrey Hanshew has a history of lumbar spine problems for which he had spinal fusion surgery in 1997. He subsequently returned to work, but his pain returned, and he stopped working in 2001.

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

Mr. Hanshew first saw Dr. Brian Darrisaw, an internist, in May of 2000 for general medical care, including ongoing complaints of low back pain radiating into both legs. Findings on physical examinations between October of 2000 and September of 2001 included positive straight leg raising,[2] hyperactive reflexes, and lumbosacral tenderness. (R. 395-404.)  Dr. Darrisaw diagnosed "back pain" and prescribed different pain medications and anti-inflammatories, including Vicodin, Naprosyn, Flexeril, and Vioxx. (R. 401-06.)  In August 2001, he prescribed Methadone and Depo-Medrol injections. (R. 398-400.)  In an undated letter, Dr. Darrisaw stated that Mr. Hanshew had a lumbar laminectomy and fusion in the past, as well as "Multiple epidural injections" and that in his opinion, "[b]ecause of the chronic back pain which occurs on a daily basis, he is unable to work and should be deemed permanently disabled."  (R. 51.)  In a letter, dated May 11, 2004, Dr. Darrisaw noted that Mr. Hanshew had severe lumbosacral disease with a lumbar laminectomy in the past with fusion and epidural injections.  (R. 52.)  Darrisaw wrote: "Because of the Chronic Back pain which occurs on a daily basis. He is unable to work and should be deemed permanently disabled. He has been unable to work for the past twelve months."  (*Id.*)

On November 20, 2001, Mr. Hanshew was first seen by Dr. Terry Horner, a neurosurgeon, for evaluation of his continued back and left leg pain.  (R. 390-91.) Examination revealed a surgical scar at the lumbosacral area, pain on extension, flexion, and lateral movement of the spine, negative straight leg raising, normal sensory

---

[2] This is a test to determine whether a herniated disk is the cause of low back pain. There is a strong correlation between a positive test and pain and other pain-related symptoms.

examination, good strength, no reflex abnormalities, and no atrophy. Horner diagnosed "a discogenic type of pain"[3] (R. 391) and recommended further radiological studies.

On December 17, 2001, Dr. Horner reviewed the results of a myelogram and CT scan, which showed no disc herniation. (R. 389.) In a chart note for January 21, 2002, Dr. Horner wrote that Hanshew continued under his care and was unable to work. (R. 159.) Dr. Horner stated that he "will better be able to determine the etiology for his pain" upon further evaluation. (*Id.*) X-rays of the lumbosacral spine dated November 20, 2001 showed minor narrowing at L4-5 but no evidence of instability or subluxation. (R. 375.) An EMG and nerve conduction studies were performed on January 22, 2002, and showed no abnormalities. (R. 362.) In a chart note dated March 28, 2002, Dr. Horner indicated that the EMG was normal and suggested a selective nerve root block to determine further treatment options, although he acknowledged that a prior block had provided no relief. (R. 160, 362.) He suggested an appointment in the pain clinic to explore further pain treatment options. (R. 160.) In a May 7, 2004 chart note, Dr. Horner confirmed that Hanshew had gotten "moderate relief" from a percutaneous spinal cord stimulator trial but that he did not want to undergo the further surgery that would be involved with permanent insertion of a spinal cord stimulator. (R. 161.) Dr. Horner recommended further treatment at the pain clinic since he had nothing more to offer to relieve Hanshew's pain. (*Id.*)

---

[3] Discogenic back pain is back pain caused by the degeneration of the lumbar intervertebral discs.

In August 2001, Mr. Hanshew was seen by Dr. Chetan Shukla, an anesthesiologist and pain management specialist, for evaluation of low back pain. X-rays taken on August 15, 2001, showed mild degenerative disc changes at L4-5 and a small osteophyte at L3-4. (R. 338.) Dr. Shukla administered a lumbar epidural steroid injection on October 5, 2001, due to what he diagnosed as post-laminectomy syndrome.[4] (R. 336-37.) X-rays taken on November 20, 2001, again showed evidence of the previous L5-S1 fusion with minor narrowing at L4-5 but no evidence of instability. (R. 334-35.) A CT scan of the lumbar spine dated November 29, 2001, showed only mild lumbar spondylosis[5] at L4-5. (R. 333.) Dr. Shukla performed another epidural steroid injection on March 13, 2002, even though the October 2001, injection provided no significant relief. (R. 331-32.) Mr. Hanshew reported no significant pain relief.

Robyn K. Goshorn, M.D., an internist, treated Mr. Hanshew beginning May 19, 2003. (R. 81.) Dr. Goshorn noted that Hanshew had extensive neurosurgical evaluation and back surgery elsewhere, continued to have severe back pain complaints, and was unable to work for 2 years due to the pain. (*Id.*) In a report for the Determination of Disability office, dated September 22, 2003, Dr. Goshorn stated she last examined Mr. Hanshew on September 3, 2003. Mr. Hanshew's history was noted for a CT myelogram that showed mild spondylosis at L4-5, extensive testing elsewhere,

---

[4] Postlaminectomy syndrome is a group of symptoms – sciatica (painful symptoms down the leg), numbness and tingling – that may occur following removal of a piece of bone in the spine, which is done to take pressure off the nerve root in the spinal cord or spinal nerves.

[5] Degenerative disease of both the disc and the zygapophyseal joints of the spine. Symptoms include pain and restriction of movement.

4

and drug therapy. (R. 45.) His medications were Fluoxetine, Gabapentin, and Naproxen. (*Id.*) It was also noted that Mr. Hanshew suffered from depression and chronic pain syndrome. (*Id.*) Dr. Goshorn opined that Mr. Hanshew's condition interfered with his ability to perform labor or services or engage in a useful occupation due to severe intractable low back pain. (R. 49.) She also stated that all treatment options had been tried without benefit and the limitations were enough to prevent any type of gainful employment. (*Id.*) Dr. Goshorn opined that Mr. Hanshew had a significant impairment in sitting, standing, walking, lifting, pushing/pulling, bending, squatting, crawling, climbing, and in repetitive leg movement, and had moderate limitations in driving, normal housework, and caring for his personal needs. (R. 50.)

In July 2002, Mr. Hanshew was evaluated by Dr. Brian Subach, a neurosurgeon in Atlanta, Georgia, for chronic back pain with left leg radicular pain despite his spinal surgery. (R. 143-45, 355-56.) Physical exam revealed limited ranges of lumbar motion, diminished sensation in an S1 distribution bilaterally, and a trace positive left straight leg raising sign. (R. 144.) Given his tenderness of the L4-5 facet joint, Dr. Subach believed that continued injection therapy might be of benefit and also recommended surgical placement of a spinal cord stimulator. (R. 145.) A trial spinal cord stimulator was placed on January 29, 2003, based on what Dr. Subach diagnosed as failed back syndrome.[6] (R. 302-11.)

---

[6] This is a term used to describe the condition of patients who have not had a successful result from back or spine surgery.

Patricia Baumann, M.D., an anethesiologist, evaluated Mr. Hanshew for complaints of back and left lower extremity pain on January 2, 2003. (R. 304-05.) Her examination revealed pain with extension and tenderness in the left paraspinous area. Dr. Baumann diagnosed failed back syndrome and lumbar radiculopathy.[7] (*Id.*) Mr. Hanshew was scheduled for a psychological clearance evaluation for a spinal cord stimulator trial with possible trial following the evaluation. (R. 305.)

On December 6, 2002, Mr. Hanshew presented to the Community Clinic at Gwinnett Hospital System with low back pain. (R. 313-16.) He also reported his history of depression secondary to pain and joblessness. Methadone had caused "itchiness," and he had also been taking Vicodin without reported side effects. He was diagnosed with chronic low back pain and depression for which he was given ibuprofen and referred to the mental health clinic. Mr. Hanshew was seen at Wishard Memorial Hospital on eight occasions between May of 2003 and December of 2004 for active low back pain. (R. 53-78, 135, 138.) No clinical findings were recorded in the sparse treatment notes, but he was repeatedly diagnosed with "chronic back pain" as well as depression and anxiety, for which he was prescribed Neurontin, OxyContin, Vicodin, Fluoxetine, Naprosyn, and Percocet. (R. 53-60.) His pain continued despite regular pain injections at the pain clinic at St. Francis. (*Id.*)

James Cole, M.D, a board certified orthopedic surgeon with a specialty in orthopedic surgery of the spine, evaluated Mr. Hanshew on December 21, 2004, for,

---

[7] Radiculopathy results when one or more nerves are affected and fail to work properly, resulting in pain, weakness, numbness or difficulty in controlling specific muscles.

among others, back and buttock pain. (R. 122-23.) On December 30, 2004, Dr. Cole performed a lumbar myelogram. (R. 126-28.) The myelogram revealed some slight encroachment on the neural foramina at L5-S1, the site of his prior decompression, fusion, and bone graft surgery; a minimal disc bulge at L4-5 very slightly flattening the lateral recesses; and mild degenerative changes in the lower thoracic and upper lumbar regions with "very slight" flattening of the thecal sac at T12-L1 and L1-2. (R. 127.) A lumbar x-ray taken revealed mild spondylitic changes at L4-5 with mild facet hypertrophy at that level. (R. 129.) On examination by Dr. Cole on January 4, 2005, there was tenderness to palpation of the left lumbar paraspinals and the iliac crest, which he diagnosed as stemming from likely facet arthropathy at L4-5 and status post L5-S1 interbody fusion. (R. 131.) A CT scan showed no "significant compression over the thecal sac." (*Id.*) Dr. Cole could recommend no surgical intervention but advised a facet injection, "which may give him some relief." (*Id.*)

*Medical Evidence of Mental Impairments*

In a letter to Dr. Darrisaw of October 12, 2001, a mental health care provider with Indianapolis Psychiatric Associates (name illegible) reported an examination of Mr. Hanshew on October 10, 2001, for complaints of back pain, difficulties with anger management, recent "rage" at work, a history of interpersonal issues and conflicts, and discord with healthcare system. (R. 394.) The provider confirmed the diagnoses of Major Depression, recurrent, moderate, and Personality Disorder not otherwise specified, for which psychiatrist Eric Jaggers prescribed Paxil. (*Id.*)

On December 20, 2002, Mr. Hanshew presented to Mr. Bonet, a licensed clinical social worker, for "opinions on how to address his stress/depression" and "how to control his temper and better ways to express it." (R. 296.) He was referred to a psychiatrist. Three weeks later on January 14, 2003, Mr. Hanshew was examined and evaluated by an M.D., whose name is illegible, due to what he described as "mood irritability" as well as disturbed sleep. (R. 293-94.) He also reported a history of domestic abuse. He had taken Zoloft for less than two months and Paxil for two to three weeks. (R. 293.) Exam showed him to be tearful at times with decreased motivation, an irritable mood, and decreased psychomotor speed. (R. 294.) He was ambivalent about taking psychotropic medications but was referred to group therapy and advised to follow up in one month. The doctor diagnosed Dysthymia (a mood disorder that is longer-lasting yet less disabling than major depression) and back pain. (R. 300.)

Since August of 2004, Mr. Hanshew has attended biweekly individual therapy sessions with a social worker at St. Francis Behavioral Health Services. (R. 91-98.) On initial evaluation, he reported angry outbursts and an inability to relax. Examination revealed a fair mood and apparent physical stiffness on rising from his seat. The social worker recommended relaxation techniques and that he focus on structuring his time. On successive visits, he reported continued physical pain, and his affect seemed "stressed" and "strained." (R. 91, 93.) On October 6 and 26 of 2004, his mood was depressed and irritable, and he reported being in a lot of pain, relying on a cane to walk. (R. 94, 95.) On December 7, 2004, he reported being in "constant pain." (R. 98.)

On March 17, 2003, Mr. Hanshew underwent psychological examination and evaluation by Dr. Gary H. Bible, Ph.D., a licensed psychologist, on the Administration's request. (R. 288-90.) In addition to his ongoing back pain, Mr. Hanshew complained that he "blow[s] up all the time, at least once a day because of pain and stress," that he is depressed, has disturbed sleep, fatigue, lack of motivation, guilt, and reduced attention and concentration, with greater depression than anxiety. (R. 289.) He said that he spent a typical day playing computer games for three hours a day, doing simple chores, and caring for his pets and left the house about three times a week to do errands. (*Id.*) Hanshew described having a "very short fuse, problems communicating," and admitted to "go[ing] off if spoken to the wrong way." (*Id.*) The mental status examination revealed disorganized grooming, intermittent pain-related behaviors, pressured and loud speech, a labile affect and mood consistent with depression and irritability, hyperactivity, an animated and agitated manner, and a reduced and variable ability to attend and concentrate. (R. 289-90.) The Beck Depression Inventory was consistent with mild levels of depression and moderate levels of anxiety. (R. 290.) Dr. Bible's diagnostic impressions were of (1) Mood Disorder Due to Chronic Pain with Mixed Features; (2) Psychological Factors Affecting Medical Condition; and (3) Rule Out Pain Disorder. (*Id.*) He assessed his Global Assessment of Functioning at 60 (*id.*), which denotes moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers). *Diagnostic and Statistical Manual of Mental Disorders-IV-TR* 34 (Am. Psychiatric Assoc. 2000). Dr. Bible found that Mr. Hanshew "probably could function within a simple and minimally demanding

9

work setting," but that his "ability to sustain focused attention/task persistence appears seriously limited" and that his ability "to manage social interactions and deal with work related stressors appears seriously limited to precluded." (R. 290.)

On April 14, 2003, a non-examining psychologist with the state agency assessed Mr. Hanshew's residual mental function on the basis of his review of the records then in the case file. (R. 270-86.) The psychologist, whose name is illegible, endorsed the finding of an unspecified affective disorder. (*Id.*) He found Hanshew "moderately limited" in his ability to maintain social functioning; to maintain attention and concentration for extended periods; to complete a normal workday and workweek; to interact appropriately with the public; to accept instructions and respond appropriately to supervisors; to get along with co-workers or peers; and to set realistic goals or make plans independently. (R. 280, 284-85.)

*Plaintiff's Testimony*

Mr. Hanshew testified that he had not worked since October of 2001 because of pain in his back, which radiates down his left hip and leg. The pain stems from an on-the-job injury incurred in June of 1996, after which he underwent an L5-S1 fusion. He continued to see doctors at a pain clinic for his back condition, and he also sees a psychologist in order to deal with the "stress" of his physical pain and of "just everything." He relied on food stamps and Medicaid as well as credit card use to meet his expenses. Upon becoming disabled, he moved into his parents' house, and in October of 2004 he moved in with his girlfriend, who worked two jobs while receiving

disability benefits.  Before moving in with his present girlfriend, Mr. Hanshew lived in Georgia with another girlfriend for "a year or two," where he also applied for disability benefits.  He met his present girlfriend in February 2004 on an on-line chat group designed as a support group for patients with back pain.

Mr. Hanshew left Georgia because he "lost [his] mind, because of this pain and all the stress that was going on."  (R. 438.)  He felt that he may become violent.  When he was in Georgia, he "jumped out of [his] car and started yelling at" another woman in the car behind him whom he believed was following him too closely, because he believed that the psychotropic medication he was then taking, Neurontin, "just didn't agree with [him]."  (R. 439.)  In December 2004, Mr. Hanshew got into another physical altercation with a man during a poker game, as a result of which he "jammed [his] thumb" and had it x-rayed and splinted.  (R. 461.)  Again he attributed his aggressive behavior to "that medicine."  (*Id.* at 461-63.)

Mr. Hanshew spent his days resting on a heating pad, and getting up now and then just to move around.  (R. 430-31.)  He used to walk, but has not done so since his left hip "went out" and he had to go to the emergency room.  (*Id.* at 445-46.)  He doesn't do much other than "look at the clock"; not even the TV interests him anymore, although he does watch some news and ESPN sports.  (R. 446, 449, 452.)  He breaks up his stints on the heating pad by getting up, moving around and stretching.  (R. 447-49.)  He walked outside the house "2 or 3 feet, and then come[s] back in the house."  (R. 450.)  He retrieves the mail.  (R. 452-53.)  Sometimes he naps until his girlfriend gets home from work in the evening.  (R. 450-51.)

11

The ALJ found that Mr. Hanshew had severe impairments of degenerative disc disease and affective disorder that prevented him from performing his past relevant work. He also found that Mr. Hanshew's allegation regarding his limitations were not totally credible. The ALJ further found that given an RFC to perform a significant range of sedentary work, Mr. Hanshew was capable of performing a significant jobs in the national economy and thus was not under a disability as defined by the Act.

*Discussion*

Plaintiff advances three basic challenges to the ALJ's decision. First, he claims the ALJ improperly discounted the opinions of his treating physicians regarding his back pain and its limiting effect on his ability to work. He also argues that the ALJ erred with respect to the findings as to his mental function limitations and failed to properly credit opinions of the consulting psychologist and state agency reviewing psychologist. Last but not least, Mr. Hanshew challenges the ALJ's determination that he was not fully credible. The court takes each argument in turn.

*Treating Physicians' Opinions*

"A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). However, "[a]n ALJ may discount a treating source's opinion if it is inconsistent with the opinion of a consulting physician, or if the treating source's opinion is internally inconsistent, as long as the ALJ minimally articulates his reasons for

12

crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (internal quotation omitted). If a treating physician's opinion is not entitled to controlling weight, it is entitled to deference and must be weighed using the factors set out in the regulations. 20 C.F.R. § 404.1527(d). A claimant is not entitled to disability benefits solely on the basis of his physicians' statements that he cannot work or is disabled. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The ALJ discounted the opinions of Dr. Darrisaw and Dr. Horner that Mr. Hanshew was "permanently disabled" and "unable to work" upon finding they were not based on objective findings. These conclusions are opinions on the ultimate issue to be decided by the ALJ – whether Mr. Hanshew is disabled – and thus are entitled to no special significance under the regulations. *See Dixon*, 270 F.3d at 1177 ("The Commissioner, not a doctor selected by the patient to treat her, decides whether a claimant is disabled."); 20 C.F.R. § 404.1527(e)(3). Further, the doctors' findings do leave room for reasonable disagreement with their opinions of the severity of Mr. Hanshew's limitations. Dr. Darrisaw's opinion of disability was based on his findings, including positive straight leg raising, hyperactive reflexes, and lumbosacral tenderness, his observations and treatment of Mr. Hanshew over a length of time, including pain medications and injection therapy. Dr. Horner, who specializes in neurosurgery, based his opinion on his review of Mr. Hanshew's CT scan, myelogram and x-rays, as well as his findings on examination which included pain on extension, flexion, and lateral movement of the spine, and his various treatments over time. While these findings

suggest that Mr. Hanshew suffers from back pain, they do not conclusively establish that the pain is severe and disabling.

Mr. Hanshew argues that the ALJ committed legal error by not discussing all of the factors set forth in 20 C.F.R. §§ 404.1527 and 416.927. Neither these regulations nor SSR 96-2p, which he cites, contains an articulation requirement. Instead, the ALJ is required to weigh the treating source opinion using those factors. A common sense reading of the ALJ's decision in this case supports the conclusion that the ALJ did weigh the appropriate factors in determining the weight to be given Dr. Horner's and Dr. Darrisaw's opinions. (*See* R. 28-30.)

These medical opinions were inconsistent with other record evidence. 20 C.F.R. § 404.1527(d) provides that a medical source opinion is entitled to significant weight only if well-supported and not inconsistent with other record evidence. August 2001 x-rays showed only mild degenerative disc changes and a small osteophyte. While Dr. Horner's November 2001 examination revealed pain, it also revealed negative straight leg raising, a normal sensory examination, good strength, no reflex abnormalities, and no atrophy. A November 2001 CT scan showed only mild lumbar spondylosis. No disc herniation was shown on the December 2001 CT scan. A January 2002 EMG and nerve conduction studies showed no abnormalities. A neurosurgeon's physical exam in July 2002 revealed only a trace positive left straight leg raising sign. A December 2004 lumbar myelogram revealed only some slight encroachment on the neural foramina at L5-S1, the site of his prior surgery; a minimal disc bulge at L4-5; and mild degenerative changes in the lower thoracic and upper lumbar regions with "very slight" flattening of

the thecal sac at T12-L1 and L1-2.  An x-ray taken revealed mild spondylitic changes at L4-5 with mild facet hypertrophy.  A CT scan showed no "significant compression over the thecal sac."  The opinions of Dr. Darrisaw and Dr. Horner that Mr. Hanshew was disabled were inconsistent with these minimal and mild findings.  Their opinions also were inconsistent with the functional capacity assessments of the state agency reviewing physicians who found Mr. Hanshew capable of performing light work.  (*See* R. 263-66, 323-26.)

*Mental Function Limitations*

Mr. Hanshew maintains that the ALJ erred in assessing his residual mental functional capacity.  Only two medical sources assessed his residual mental function: Dr. Bible, the consultative examining psychologist, and the state agency reviewing psychologist.  Mr. Hanshew concedes that the ALJ correctly summarized Dr. Bible's findings, but claims that he failed to include all of them in his mental function assessment.  Specifically, the ALJ credited the finding that Mr. Hanshew was limited to no more than simple and repetitive work.  It is argued that the ALJ did not credit or expressly reject Dr. Bible's findings that his ability to deal with "work related stressors" was "seriously limited to precluded" and that his ability "to manage social interaction" was "seriously limited to precluded."  The ALJ's mental function assessment is consistent with Dr. Bible's findings of what amount to only mild mental health problems – Dr. Bible gave Mr. Hanshew a GAF of 60, which reflects only moderate symptoms or moderate difficulty in social, occupational, or school functioning, *Diagnostic and Statistical Manual of Mental Disorders-IV-TR* 34 (Am. Psychiatric Assoc. 2000).  And

15

despite finding that Mr. Hanshew's "ability to sustain focused attention/task persistence appears seriously limited" and that his ability "to manage social interactions and deal with work related stressors appears seriously limited to precluded," Dr. Bible concluded that Mr. Hanshew "probably could function within a simple and minimally demanding work setting." Similarly, the state agency reviewing psychologist determined that Mr. Hanshew had only moderate mental function limitations. Any failure to mention this corroborative mental function assessment was not error. Consistent with this evidence, the January 2003 psychological examination of Mr. Hanshew resulted in a diagnosis of Dysthymia, a mood disorder that is less disabling than major depression. The ALJ limited Mr. Hanshew to "simple and repetitive work with no more than superficial interaction with the general public, co-workers, or supervisors," which seems to account for the mental limitations recognized by Dr. Bible, the state agency reviewing psychologist, and the other mental health evidence.

*Mr. Hanshew's Credibility*

Mr. Hanshew challenges the ALJ's credibility determination, but the court finds no error there. The court has greater room to review an ALJ's credibility finding where it rests on objective factors, such as the absence of clinical support. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). The ALJ cannot "reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. § 404.1529(c)(2). Here, the ALJ found that the objective evidence failed to support Mr.

Hanshew's allegations of disabling pain and functional limitations. His physical examinations and tests were either normal or showed only mild findings. As explained, substantial objective medical evidence in the record was inconsistent with the opinions of disability of Dr. Darrisaw and Dr. Horner.

The ALJ relied heavily on the absence of objective medical evidence to substantiate Mr. Hanshew's claims, but his credibility determination did not rest solely on the absence of such evidence. The ALJ considered Mr. Hanshew's daily activities which support the conclusion that he does not have disabling pain and functional limitations. The ALJ noted that Mr. Hanshew does housework, laundry, fixes food, takes care of pets, shops, runs errands, and goes fishing and boating, and that when he got in an argument with his girlfriend he started walking from Florida back to Indiana, which in the ALJ's view "appears to say it all." Though the ALJ erred in believing that Mr. Hanshew was walking to Indiana, the attempt to walk from one state to another, regardless of how far Mr. Hanshew actually walked, is not consistent with disabling pain and other disabling limitations. The Seventh Circuit has said that "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford*, 227 F.3d at 872; *see also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ should have explained the 'inconsistencies' between Zurawski's activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence"). Mr. Hanshew's activities are not minimal. By way of example, Mr. Hanshew reported to Dr. Bible that he runs errands 3 times a week. Nor does the evidence suggest that they are punctured with periods of rest. Mr. Hanshew

testified about two altercations he has been in, one of which became physical and resulted in physical injury to himself. His physical ability to participate in these altercations suggests that his claims of disabling pain and functional limitations are not believable.

SSR 96-7p sets out the factors that the ALJ must assess when making a credibility analysis: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. Mr. Hanshew contends that the ALJ evaluated only his daily activities and a perceived lack of objective evidence. The court disagrees. The ALJ's discussion of the record evidence suggests that he also considered the other factors, including Mr. Hanshew's pain and other symptoms, his medications, treatments other than medication such as the epidural injections and a spinal stimulator, other measures such as a heating pad, his testimony at the hearing. The ALJ's credibility determination is not patently erroneous.

*Conclusion*

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment or Remand (Doc. No. 16) is **DENIED** and the Commissioner's final decision is **AFFIRMED**. A final judgment will be entered separately.

ALL OF WHICH IS ENTERED this 28th day of September 2007.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Charles E. Binder
fedcourt@binderandbinder.com

Thomas Kieper
tom.kieper@usdoj.gov